RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0301p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 08-4540

FAYEZ DAMRA, aka ALEX DAMRA,

*Defendant-Appellant.*

—————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 06-00367-001—Lesley Brooks Wells, District Judge.

Argued: June 15, 2010

Decided and Filed: September 15, 2010

Before: KEITH, BOGGS, and McKEAGUE, Circuit Judges.

—————————

## COUNSEL

**ARGUED:** Richard L. Stoper, Jr., ROTATORI BENDER CO., L.P.A., Cleveland, Ohio, for Appellant. James V. Moroney, Jr., ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Richard L. Stoper, Jr., J. Timothy Bender, ROTATORI BENDER CO., L.P.A., Cleveland, Ohio, for Appellant. James V. Moroney, Jr., ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

—————————

## OPINION

—————————

McKEAGUE, Circuit Judge. Fayez "Alex" Damra ("Damra") was convicted of evading corporate income tax in violation of 26 U.S.C. § 2701 and of, together with his brother, Fawaz Damra ("Fawaz"), conspiring to defraud the United States in violation of 18 U.S.C. § 371. He now appeals his conviction and sentence. We affirm Damra's

1

conviction, but – as the district court incorrectly sentenced Damra at offense level 16 instead of level 15 – vacate Damra's sentence and remand for resentencing at the correct offense level.

## I.

During the late summer or early fall of 2004, Special Agent Gary Rasoletti of the Criminal Division of the IRS was assigned to a financial investigation of Fawaz, then the Imam of the Islamic Center of Cleveland.  In June of 2004, Fawaz had been found guilty of unlawfully obtaining citizenship in violation of 18 U.S.C. § 1425 by making false statements in a citizenship application and interview. *See United States v. Damrah*, 412 F.3d 618, 620 (6th Cir. 2005).  In September of 2004, the district court sentenced Fawaz to serve two months in prison, and ordered that Fawaz's citizenship be revoked pursuant to 8 U.S.C. § 1451(e); we affirmed Fawaz's conviction on March 15, 2005. *Id.* In reviewing Fawaz's tax returns, Rasoletti noticed that for a single year (1999) Fawaz had filed a Schedule C reporting $100,000 of income received as a consultant for a software company.  (Fawaz paid $18,239.15 of income tax on this $100,000.)  Rasoletti determined that the funds had come from Applied Innovation Management ("AIM"), a California company controlled by Damra.  Rasoletti then contacted Mir Ali, Fawaz's regular tax-return preparer; Rasoletti also arranged for Ron Gesell, another IRS investigator, to carry a subpoena seeking AIM records to Damra, who was then operating in Las Vegas.

**The Investigation of Fayez Damra**

When Gesell served the subpoena on October 7, 2004, Damra agreed to answer questions.  At trial, Gesell testified that Damra stated that: he was the youngest of nine children; his parents lived in Jerusalem; he himself had come to the United States in the early 1980s; he was not a citizen, but had a green card; and he had graduated in 1987 from Purdue University with majors in computer engineering and mathematics, and had received a master's degree from Purdue in 1989 in aerospace engineering.  In addition, Gesell testified, Damra stated that: (1) he had founded AIM in 1993 with a partner

named Robert Sparkman; (2) he and Sparkman had found approximately 25 investors (including Fawaz) who each invested between $15,000 and $20,000 in the business; (3) the investors were bought out in 1998 or 1999 for approximately three to four times what they had invested; and (4) in February of 2000 Damra had moved AIM from California to Las Vegas. (In fact, in 2000 Damra closed the California corporation AIM and founded Eigen Software in Las Vegas. Eigen did business as AIM.) Damra then reportedly told Gesell that between 1999 and 2002 he, Damra, had sent approximately $25,000 to his father by sending it to Fawaz, who would forward it on to Jerusalem. Because he thought Fawaz was skimming, Damra reportedly began sending the money directly. Damra reportedly explained that he had lent Fawaz small amounts of money in 1995 and had given Fawaz's wife $4,000 in 2004 to pay for dental work for Fawaz's children.

Following Gesell's interview, James Moroney, an Assistant United States Attorney (ASUA) in Cleveland, received a letter dated November 5, 2004 from Wolfe Thompson, an attorney acting for Damra and AIM. In the letter, Thompson reported that Damra had located two checks (totaling $10,500) payable to Fawaz from AIM "representing gifts from Fayez (Alex) Damra to his brother." (App'x at 294.) The gifts "were accounted for by the corporation as compensation paid to Fayez (Alex) Damra for consultant services rendered to the company." (App'x at 294.)

On January 11, 2005, Moroney received a follow-up letter from Damra stating that he was terminating Thompson's involvement and would "answer every question in detail" himself. (App'x at 216.) Damra then discussed his relationship with Fawaz:

> [T]he reason I'm involved in this matter is due to my disgruntle [*sic*] brother "Fawaz Damra". This man has caused more pain in my life than any one man deserves and this proves it. I say this because it is in summary what this is all about. I have told the agents, and Wolfe what [*sic*] the money that Fawaz received from me or the company is my own money that is intended for my sick father that I worship. . . . His faith in me proved to me that he was right. I have achieved in life more than the whole clan combined. Fathers know their gifted off spring. . . . As for my brothers and the rest of the family, they use my father as bribery and guilt to help him due to the fact I can't be with him. They skimmed and

stole from me numerous times as I tried to provide for him and them. I know that because every time I ask any of them including "Fawaz" I get a different story. At the time my only option was to provide a few dollars was Fawaz [*sic*] due to his offer that this is no excuse for me not to send the money. When my family started telling me about the amount I know I gave Fawaz and what arrived it is a whole different number.

(App'x at 216-17.) "I have to meet with you . . . as soon as possible," Damra concluded. (*Id.*)

On February 7, 2005, both Rasoletti and Moroney met with Damra in Cleveland. At trial, Rasoletti testified that during this interview, Damra stated that: (1) in 1993, Sparkman, Damra's partner, had resigned from AIM after Damra caught him embezzling; (2) Fawaz had invested between $20,000 and $40,000 in AIM, which money Damra thought Fawaz had gotten by skimming from his mosque; and (3) in 1999, Damra paid Fawaz two to three times the value of the original investment. Damra also reportedly explained that, in 1999, he had hired Fawaz as a consultant, because Fawaz had contacts with Arab businessmen. Despite not bringing in any business, Fawaz reportedly called Damra later in the year seeking $60,000 in compensation. Rasoletti testified that Damra stated that he ultimately sent Fawaz $100,000 as a "divorce payment" after "receiving a phone call from the family in the West Bank guilting him into paying Fawaz." (Trial Tr. at 524-25.) Damra split the funds into two checks of $50,000 apiece for Fawaz and Fawaz's wife, Nesreen, because "that's what Fawaz requested." (Trial Tr. at 526.) Damra then deducted the $100,000 as a consulting expense.

Together with Gesell, Rasoletti met with Damra for a third time in Las Vegas on April 21, 2005. According to Rasoletti's later testimony, at this meeting Damra made numerous damaging admissions, stating that: (1) he had made payments from AIM to family members in the Middle East to get his brothers off of his back, but had no business dealings there; (2) he sent checks from AIM to his brother Nader Damra because "he could afford to," but that "he now understands he just can't write checks to anybody"; (3) some checks to Nader were marked "business development" because his brother wanted to start a new business, and others were marked "consulting" although

Nader was not an AIM consultant; (4) a $32,000 check to "Al Adhamieh General Trade" was actually a check to Nader, though Damra had falsely told his accountant that the check was for "software development"; and (5) "I mishandled the money, there is abuse here." (*Id*. at 528-31, 537.) Rasoletti testified that he then explained to Damra that, because Damra's 1997 and 1998 tax returns showed that Damra made only $20,000 a year, Rasoletti believed that Damra must be getting the money to write these checks out of his company. In response, Rasoletti testified, Damra "just kind of shook his head and said yes." (*Id.* at 532.) Finally, Rasoletti testified, Damra stated that Fawaz "had not done $5 of work for AIM" and was not qualified to be an AIM consultant. (*Id.* at 533-34.) "I will accept responsibility," Damra reportedly stated; "this is not right." (*Id.* at 533.) Damra added that "it was a gray area" whether his actions were in violation of the law. (*Id*. at 534.) Rasoletti also testified that he showed Damra two checks totaling $32,000 (classified as consulting expenses) written from AIM to Charles Schwab setting up a personal account for Damra, and that Damra was surprised.

**The Indictment and Pretrial Proceedings**

On July 25, 2006, a grand jury indicted Damra and Fawaz on three counts: Count 1 alleged that Damra and Fawaz had conspired to defraud the United States in violation of 18 U.S.C. § 371 for the purpose of obstructing the IRS's lawful government functions; Count 2 alleged that Damra alone had committed corporate tax evasion under 26 U.S.C. § 2701 by filing a fraudulent 1999 Form 1120 for AIM and by causing funds paid from AIM to Fawaz to be falsely reported as Schedule C gross receipts on Fawaz's 1999 Form 1040; and Count 3 alleged that Fawaz alone had aided and abetted in the preparation of a fraudulent Form 1040. Damra and Fawaz were arraigned on August 21, 2006. At the time, Fawaz was in ICE custody in Monroe, Michigan, and – having stipulated on January 9, 2006 to removability from the United States – was awaiting a host country to accept him for deportation. The court ultimately did not issue bond for Fawaz, but instead returned Fawaz to ICE custody, so as to preserve his right to file for habeas corpus relief after a period of continuous custody without being deported. *See INS v. St. Cyr*, 533 U.S. 289 (2001). At arraignment, the court also advised Damra to retain

counsel. Despite sporadically retaining and dismissing attorneys, and despite being regularly advised to seek counsel, Damra represented himself throughout most of the proceedings.

Following the arraignment, Fawaz filed a motion for a separate trial pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), arguing that the introduction of Damra's statements to Gesell, Moroney, and Rasoletti would violate Fawaz's Sixth Amendment right of confrontation. In response, the government stated that "if any statement of Alex Damra is determined herein to present a *Bruton* problem, that statement will not be offered so as to preserve a joint trial." (R. 32 at 2.) In October and November of 2006, the district court twice pushed back the trial. During a status conference on January 8, 2007, the government advised the court that Israel had agreed to accept Fawaz, and that Fawaz had been deported on January 2, 2007. (At the time Fawaz was deported, his motion for a separate trial was still pending; it has never been withdrawn.) Given national security concerns, the government explained, it had been unable to give the district court or the defense any notice. Fawaz's attorney moved to dismiss the indictment. The court denied the motion and issued an arrest warrant to provide for trial in the event Fawaz ever re-entered the country.

At a status hearing on February 13, 2007, Damra stated that he wanted his brother as a witness, and asked whether he needed to file a motion stating so. The government, meanwhile, moved to admit at trial the statements Fawaz had made to tax preparers as the statements of a co-conspirator under FED. R. EVID. 801(d)(2). On April 26, 2007, the district court granted the prosecution's motion. On April 30, 2007, Damra filed a motion objecting to the admission of this evidence as a violation of his Sixth Amendment rights and arguing that the government was responsible for Fawaz's being unavailable. The district court denied Damra's motion the next day.

**The Trial**

Trial began on April 30, 2007, and continued for five days. The prosecution was handled by AUSA Moroney, who was joined at the prosecution table by Rasoletti. The government called seven witnesses: Alan David, AIM's California accountant; Barbara Burrer, Eigen Software's Las Vegas accountant; Penny Moore, an IRS representative; Mir Ali, Fawaz's tax-return preparer for 1997, 1998, and 2000 (but not 1999); Bernard Niehaus, Fawaz's tax-return preparer for 1999; Agent Gesell; and Agent Rasoletti. Gesell and Rasoletti testified as to the conversations they had with Damra, and repeated the admissions they said he had made.

David and Burrer both testified that AIM wrote numerous checks – but did not, as far as they knew, issue 1099s – to individuals Damra said were consultants. Burrer, in fact, "fired" Damra as a client after warning him twice about his business practices. As she explained at trial: "I don't keep clients that don't follow the law." (Trial Tr. at 279.) David and Burrer also testified regarding a $250,000 check that AIM wrote to Eigen, which was deducted on AIM's books as an expense but which the government argued represented some of Damra's profits from AIM. "I understood that it was a software development expense, and assumed it would be picked up as income, reported as income to this Eigen," David testified. "Had I known that it was – or if it were a distribution of personal money, it would have been classified as a liquidating distribution." (*Id*. at 251.) Burrer testified that Damra told her that he was selling the rights to some personally-developed software. The money, Burrer added, "should have been deducted on the 1999 corporate tax return." (*Id.* at 281.)

Mir Ali, an elderly native of India who had appreciable hearing difficulties, and spoke quickly in accented English, testified that he had prepared Fawaz's taxes for several years, but that he refused to file Fawaz's 1999 return because he thought Fawaz was trying to claim income he had not earned. On direct examination, Ali also testified that Fawaz told him that Fawaz had received the money from his brother in California, and that Fawaz wanted to report the $100,000 as his own income because "[the brother] is in the high income bracket." (*Id.* at 325.) Fawaz returned to him in 2000, Ali added,

but was no longer claiming any income from consulting for a computer software company. "He knew that I knew it was just a fraud on his part, and he corrected himself and came," Ali explained. (*Id.* at 336.)

Due to Ali's age, heavy accent, inability to hear clearly, and difficulty confining himself to answering questions, there were numerous instances during Ali's testimony when Ali, the attorneys, the judge, or the court reporter had difficulty understanding exactly what was being said or asked. After testifying on May 1, Ali promised to bring fresh batteries for his hearing aid when he returned the following day. At that point, Damra expressed some concerns to the court, stating that he "believe[d] the witness indeed has a hearing problem" and that he was worried about being too aggressive in stopping Ali from going off on tangents. (*Id.* at 357.) In response, the district court noted:

> The Court made some changes the second day of testimony to accommodate these difficulties, including situating Mr. Ali so that he might hear better and placing Special Agent Rasoletti nearby to, when necessary, repeat Alex Damra's questions during the defendant's cross examination. These arrangements were made for the jury, to facilitate the testimony of Mr. Ali in light of Alex Damra's extraordinarily rapid speech pattern.

(R. 103 at 9-10.) In addition, the judge placed herself between Ali and the jury in order to better control Ali and stop him when he showed signs of rambling.

On cross-examination, Ali repeated the same basic testimony he had given on direct examination, stating: "[Fawaz] just told me that 'My brother in California has very successful year, and he's in high bracket. He wanted me to report $100,000 in my bracket, which would be lower than his.'" (Trial Tr. at 374.) While the transcript demonstrates that Rasoletti faithfully repeated Damra's questions to Ali, it also demonstrates that there were numerous times when Ali himself could not be heard or understood, and the court reporter instead relied upon Rasoletti's reptition of what Ali had said.

Bernard Niehaus, who ultimately prepared Fawaz's 1999 tax return, testified that he prepared Fawaz's return to show $100,000 of consulting income, and that he gave the return to Fawaz on July 31, 2000. Penny Moore testified that Fawaz and Nesreen Damra's 1999 income tax return had been mailed on August 3, 2000, and received August 7, 2000. The tax return, she added, bore Niehaus's signature, but was processed without the taxpayers' signatures in order to be timely and avoid triggering interest and penalties.

Damra, asking himself questions, testified as the sole defense witness. He stated that he had never spoken to Fawaz about Fawaz's taxes, and that Fawaz had been paid back for investing $25,000 in AIM in 1992 or 1993. On cross-examination, Damra denied making any of the statements which Gesell and Rasoletti had testified. He explained that he split the $100,000 between Fawaz and Nesreen because Fawaz had asked him to do so. He also admitted that Fawaz was not qualified to be an AIM consultant, but that Fawaz deserved the money he was paid.

On May 4, 2007, the jury found Damra guilty on both counts of the indictment that applied to him.

**The Post-Trial Proceedings**

After being convicted, Damra hired counsel and filed a motion for a new trial, arguing that the government had presented insufficient evidence to warrant conviction on Count 1 and that the district court had failed to instruct the jury on a defense of "good faith misunderstanding of the law" as to Count 2. The district court denied Damra's motion on October 25, 2007. On April 2, 2008, Damra filed a motion to dismiss the indictment and for reconsideration of the order denying his motion for a new trial. Damra asserted various deficiencies in the district court's jury instructions and argued that Count 1 of the indictment failed to state a claim under 18 U.S.C. § 371. The district court denied this motion on September 12, 2008. By this time, Damra's counsel had withdrawn, and so Damra represented himself at sentencing.

At the sentencing hearing, held on October 21, 2008, the parties and the district court focused on the tax-loss deficiency attributable to Damra's actions.  The third revision of the Presentencing Invesigation Report (PSR) recommended that Damra be sentenced at offense level 19, for a sentencing range of 30-37 months.  After hearing arguments, the district court struck $500,000 from the tax loss computation, thus reducing Damra's sentencing level to 18.  Damra argued that the court should similarly strike another $250,000 from the tax-loss computation; in a sentencing memorandum filed before sentencing, he had already argued that the court should give him credit for the $18,239.15 Fawaz paid in personal income tax on the $100,000 shifted from AIM.  The court did not respond explicitly to either argument, but, in the end, it concluded the $250,000 in the tax-loss calculation and disregarded the $18.239.15.  The court then concluded that, given that Damra was proceeding pro se in his third language, the two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 was inappropriate; this reduced Damra's offense level to 16, for a range of 21-27 months.  The court ultimately sentenced Damra at the lowest end of the Guideline range: 21 months of imprisonment and three years of supervised release, with restitution of $274,389 and a fine of $50,000.

Damra filed a timely notice of appeal on October 29, 2008.  On April 9, 2009, the district court issued an order denying Damra's supplemental motion for release pending appeal, in which it also responded to Damra's arguments that the government had violated his Sixth Amendment right of compulsory process by deporting Fawaz before trial and that the court had erred in including the $250,000 when calculating the tax loss attributed to Damra.

## II.

Damra's first argument is that the government violated his Sixth Amendment right of compulsory process by deporting his brother.  "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ."  U.S. CONST. amend. VI.  We review claimed violations of the compulsory process right *de novo*.  *United States v. Walls*, No. 95-2373, 162 F.3d 1162

(Table), 1998 WL 552907, at *3 (6th Cir. Aug. 11, 1998). Our case law involving compulsory process claims regarding deported witnesses is sparse; our leading (and only published) case is *United States v. McLernon*, 746 F.2d 1098 (6th Cir. 1984), in which we applied the Supreme Court's holding in *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), similarly the only Supreme Court case on this precise subject. In light of the Supreme Court's subsequent ruling in *Arizona v. Youngblood*, 488 U.S. 51 (1988), however, we think it is appropriate to revisit *McLernon*, and to revise the test we laid out in that case to bring it into line with those of our sister circuits. Applying our revised test, we find that Damra cannot meet either the burden of demonstrating that the government acted in bad faith or the burden of demonstrating that Fawaz's testimony would have been material and favorable, and so necessarily cannot demonstrate that the government violated his Sixth Amendment rights.

### A. *Valenzuela-Bernal*

In 1982, the Supreme Court in *Valenzuela-Bernal* directly addressed to what extent the right of compulsory process is implicated when the government deports an individual that a criminal defendant wishes to call as a witness at trial. Valenzuela-Bernal himself was arrested and charged with transporting an illegal alien named Enrique Romero-Morales. 458 U.S. at 860. After stopping the car Valenzuela-Bernal was driving, law enforcement apprehended Valenzuela-Bernal, Romero-Morales, and two of the other four passengers in the vehicle. *Id.* at 861. Following their arrest, Valenzuela-Bernal, Romero-Morales, and the two others admitted that they were in the country illegally; Valenzuela-Bernal admitted that he was transporting the others, and the others identified Valenzuela-Bernal as the driver of the car. *Id.* The government detained Romero-Morales "to provide a nonhearsay basis for establishing that respondent had transported an illegal alien," but deported the other two passengers almost immediately after an Assistant United States Attorney concluded that they "possessed no evidence material to [Valenzuela-Bernal's] prosecution or defense." *Id.* Valenzuela-Bernal argued that the indictment against him needed to be dismissed because the deportation of the other two passengers violated his Sixth Amendment right

to compulsory process for obtaining witnesses and "deprived him of the opportunity to interview them to determine whether they could aid in his defense." *Id.* As the Court added, however, he "made no attempt to explain how the deported passengers could assist him in proving that he did not know that Romero-Morales was an illegal alien . . . ." *Id.*

Holding that "[t]he mere fact that the Government deports [illegal-alien] witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment," *id.* at 872-73, the Court concluded that Valenzuela-Bernal had not demonstrated any constitutional violation. "[T]he responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution," the Court concluded. *Id.* at 867.

> [T]he Government is charged with a dual responsibility when confronted with incidents such as that which resulted in the apprehension of respondent. One or more of the persons in the car may have violated the criminal laws enacted by Congress; but some or all of the persons in the car may also be subject to deportation as provided by Congress. The Government may, therefore, find itself confronted with the obligation of prosecuting persons in the position of respondent on criminal charges, and at the same time obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted.
>
> The power to regulate immigration – an attribute of sovereignty essential to the preservation of any nation – has been entrusted by the Constitution to the political branches of the Federal Government. "The Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens.'" In exercising this power, Congress has adopted a policy of apprehending illegal aliens at or near the border and deporting them promptly. Border Patrol agents are authorized by statute to make warrantless arrests of aliens suspected of "attempting to enter the United States in violation of . . . law," and are directed to examine them without "unnecessary delay" to determine whether "there is prima facie evidence establishing" their attempted illegal entry. Aliens against whom such evidence exists may be granted immediate voluntary departure from the country. Thus, Congress has determined that prompt deportation, such

as occurred in this case, constitutes the most effective method for curbing the enormous flow of illegal aliens across our southern border.

\*      \*      \*

Congress' immigration policy and the practical considerations discussed above demonstrate that the Government had good reason to deport respondent's passengers once it concluded that they possessed no evidence relevant to the prosecution or the defense of respondent's criminal charge.  No onus, in the sense of "hiding out" or "concealing" witnesses, attached to the Government by reason of its discharge of the obligations imposed upon it by Congress; its exercise of these manifold responsibilities is not to be judged by standards which might be appropriate if the Government's only responsibility were to prosecute criminal offenses.

*Id.* at 863-66 (citations omitted).

With this ruling, the Court explicitly reversed the Ninth Circuit's holding that "a constitutional violation occurs . . . [whenever] 'the [deported] alien's testimony could conceivably [have] benefit[ed] the defendant." *Id*. at 862.  The Court then turned to the specific evidence that a defendant is required to produce to demonstrate that the government has violated his Sixth Amendment right to compulsory process:

[M]ore than the mere absence of testimony is necessary to establish a violation of the right.  Indeed, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him "compulsory process for obtaining *witnesses in his favor*."  In *Washington* [*v. Texas*], this Court found a violation of this Clause of the Sixth Amendment when the defendant was arbitrarily deprived of "testimony [that] would have been *relevant* and *material*, and . . . *vital* to the defense."  This language suggests that respondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of the passengers deprived him of their testimony.  He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.

*Id.* at 867 (citations omitted).

The Supreme Court also explicitly addressed Valenzuela-Bernal's argument that forcing him to bear the burden of demonstrating materiality would be unjust in light of

the fact that the two illegal aliens at issue were deported immediately, such that "neither he nor his attorney was afforded an opportunity to interview the deported witnesses to determine what favorable information they possessed." *Id.* at 870. In response, the Court reasoned that "while this [fact] may well support a relaxation of the specificity required in showing materiality, we do not think that it affords the basis for wholly dispensing with such a showing." *Id.* The Court continued:

> [W]hile a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of *how* a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality.
>
> \*       \*       \*
>
> A violation of th[is] provision[] requires some showing that the evidence lost would be both material and favorable to the defense.
>
> Because prompt deportation deprives the defendant of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess, however, the defendant cannot be expected to render a detailed description of their lost testimony. But this does not . . . relieve the defendant of the duty to make some showing of materiality.
>
> \*       \*       \*
>
> As in other cases concerning the loss of material evidence, sanctions will be warranted for deportation of alien witnesses only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact.

*Id.* at 871-74.

Fairly read, *Valenzuela-Bernal* stands for three propositions: (1) that there is no violation of the Compulsory Process Clause where the government deports a potential witness unless the defendant "make[s] some plausible showing of how [the witness's] testimony would have been both material and favorable to his defense," *id*. at 867; (2) that, where the defendant did not have any opportunity to interview the witness before deportation, this showing of materiality and favorability "may well [be] relax[ed in] specificity," but even if the defendant cannot "make any avowal of *how* a witness

may testify," nonetheless, in such circumstances "the events to which a witness might testify, and the relevance of those events to the crime charged," must "demonstrate . . . the presence . . . of the required materiality," *id*. at 870-71; and (3) that regardless, no sanction (such as dismissal of the indictment) is merited unless there is "a reasonable likelihood that the testimony could have affected the judgment of the trier of fact," *Id*. at 874. Of these three propositions, the most important by far is the first, which summarizes the overarching point: to demonstrate a violation of compulsory process where the government has deported a potential witness, a defendant must somehow show that the witness's testimony would have been both material and favorable.

### B.  The *McLernon* Test

Two years after *Valenzuela-Bernal*, we, reading that case, established a three-prong test for determining whether the government acted in good faith in deporting a witness. As we observed:

> In *United States v. Valenzuela-Bernal*, the Supreme Court found that "the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution." Before concluding that the government exercised its duties in "good faith," we must find that (1) the testimony of the witness would not have been "both material and favorable to the defense,"; (2) the government did not facilitate the "prompt deportation" of the illegal-alien witness; and (3) the witness' prompt deportation did not deprive the defendant and his attorney of "an opportunity to interview the witness to determine precisely what favorable evidence" he might offer.

*McLernon*, 746 F.2d at 1121 (citations omitted). We thus described the showing of materiality and favorability as one prong of demonstrating the government's bad faith; we were also arguably unclear regarding the fact that it is the *defendant* who bears to burden of demonstrating these elements.

In retrospect, it seems that this test does not conform well to the dictates of *Valenzuela-Bernal*. Neither the second nor the third *McLernon* prongs, for example, has any basis in *Valenzuela-Bernal*. The *Valenzuela-Bernal* Court did not hold that "the

government [may not] facilitate the 'prompt deportation' of the illegal-alien witness";
indeed, in *Valenzuela-Bernal*, the government had done exactly that, and the Court found
no constitutional violation. The "promptness" of the deportation was simply not a factor
in the Court's analysis; rather, it was relevant only to the extent it deprived the defendant
of a chance to interview the witnesses, which in turn lowered the specificity threshold
of the required materiality showing. Similarly, *Valenzuela-Bernal* did *not* hold that
depriving the defendant of "an opportunity to interview the witness" had any inherent
constitutional consequence, other than lowering the specificity of the materiality
showing required to establish a compulsory-process violation. It is quite clear under
*Valenzuela-Bernal* that the defendant is not required to show that he was deprived of an
opportunity to interview the witness in order to establish a violation, and it is even
clearer that the government is not required to show that the defendant *did* have such an
opportunity in order to defeat a Compulsory Process Clause claim. Despite the
shortcomings in the *McLernon* test, however, we have not revisited the question of
compulsory process violations in this context since 1984.

## C. The Effect of *Youngblood*

While *Valenzuela-Bernal* is the only Supreme Court opinion explicitly
addressing an alleged violation of compulsory process where the government has
deported a witness, four years after we laid out the *McLernon* test, the Supreme Court
in *Youngblood* rendered a decision that has powerful implications for our approach to
these sorts of claims. *Youngblood* actually addressed whether the police violated a
defendant's due-process (rather than compulsory-process) rights by destroying
"potentially useful" DNA evidence that had not yet been tested, and as such, was not
known by the police to be exculpatory. 488 U.S. at 58. While this sort of question
seems different from the one presented in *Valenzuela-Bernal* and this case,[1] the

---

[1]*Youngblood*, for example, involved a challenge under the Due Process Clause, not the
Compulsory Process Clause. That said, however, the Court in *Valenzuela-Bernal* appeared to treat
identically the defendant's due-process and compulsory-process claims, both of which were based on the
deportation of potential witnesses. *See Valenzuela-Bernal*, 458 U.S. at 872 (stating that the Court "ha[s]
borrowed much of [its] reasoning with respect to the Compulsory Process Clause of the Sixth Amendment
from cases involving the Due Process Clause of the Fifth Amendment").

*Youngblood* Court nonetheless spoke broadly of "what might loosely be called the area of constitutionally guaranteed access to evidence," *id*. at 55 (quoting *Valenzuela-Bernal*, 458 U.S. at 867) – a concept that originated in *Valenzuela-Bernal* and that applies equally to the metaphorical "destruction" of potentially useful deported-witness testimony not known by the government to be exculpatory.    Ultimately, citing *Valenzuela-Bernal* in support, the *Youngblood* Court concluded "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58.

    *Youngblood*, then, can be read as modifying or clarifying *Valenzuela-Bernal* by adding a threshold requirement that any defendant arguing violation of his right of compulsory process – or any constitutional violation involving the loss of potentially exculpatory evidence – show that the government acted in bad faith (in, for example, deporting a potential witness).  The Second, Seventh, Ninth, and Tenth Circuits have all viewed the decision in this light.  *See United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) ("Notably, in *Youngblood*, the Court reaffirmed this holding by pointing to *Valenzuela-Bernal* as an example of a case in which the defendant was required to show bad faith.  If bad faith is shown, the defendant has satisfied the first prong of the *Valenzuela-Bernal* test, but he must still show that the evidence would be material and favorable to his defense.") (citations omitted); *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997); *United States v. Dring*, 930 F.2d 687, 693-94 (9th Cir. 1991); *Buie v. Sullivan*, 923 F.2d 10, 11-12 (2d Cir. 1990).  The Ninth Circuit, for example, explicitly read *Valenzuela-Bernal* (as modified by *Youngblood*) as imposing a two-step test for compulsory-process claims in the context of deported witnesses, under which "the defendant must make an initial showing that the Government acted in bad faith *and* [then show] that . . . the testimony of the deported witness would have been material and favorable to his defense . . . ." *Dring*, 930 F.2d at 693-94.

    We think that these circuits have correctly analyzed the effect of *Youngblood* on *Valenzuela-Bernal*.  Accordingly, to comply with this reading of these cases, we hereby modify our test for violations of compulsory process in the context of deported witnesses

from the three-prong test we stated in *McLernon* to a two-prong test more in line with those stated by our sister circuits: in order to demonstrate that the government has violated his right of compulsory process, a defendant must first make an initial showing that the government has acted in bad faith, and, having made that showing, must then make some plausible showing that the testimony of the deported witness would have been both material and favorable to his defense.[2] *See Valenzuela-Bernal*, 458 U.S. at 867; *Youngblood*, 488 U.S. at 58; *Dring*, 930 F.2d at 693-94. Whether the defendant had an opportunity to interview that witness before deportation is relevant, but not dispositive, to the materiality and favorability determination; the defendant must demonstrate materiality and favorability either by some plausible avowal of how a witness may testify, or else by a plausible description of "the events to which a witness might testify, and the relevance of those events to the crime charged." *Valenzuela-Bernal*, 458 U.S. at 868, 871. Moreover, the defendant's unsupported word alone is not sufficient to demonstrate materiality and favorability where the defendant maintains only that the potential witness "could explain" or "might have testified" in some favorable fashion. *See Iribe-Perez*, 129 F.3d at 1173. In any case, no sanction is merited unless there is "a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Valenzuela-Bernal*, 458 U.S. at 874.

### D. Application of This Test to Damra

Damra here cannot meet the burden of demonstrating either prong (bad faith or materiality-and-favorability) of this test.

The only argument Damra offers to demonstrate bad faith is that he was relying on the government's supposed promise that Fawaz would be present for trial. Damra is referring to an exchange during a status conference on September 14, 2006, in which Fawaz's counsel explained Fawaz's immigration status to the district court, stated that Fawaz was in ICE custody "awaiting deportation," and eventually concluded that

---

[2]The first *McLernon* prong similarly addresses whether a defendant can show that a deported witness's testimony would have been material and favorable. Thus, any defendant unable to meet the test we have laid out here because of a failure to demonstrate materiality and favorability would necessarily fail to meet the *McLernon* test as well.

"[w]henever the Court needs him to come back here, the Court can order him, and he'll be here for trial or for whatever proceedings the Court deems necessary." The prosecutor then responded, "Your Honor, if I may, just to inform the Court, that what [Fawaz's counsel] says is accurate." Despite Damra's protestations, however, the government never *promised* Damra or the Court that Fawaz would not be deported before trial, nor is such a promise fairly implied from the prosecutor's statement. As Damra offers no other evidence of bad faith on the part of the government, he necessarily cannot demonstrate that the government violated his right of compulsory process by deporting Fawaz.

Even were Damra able to demonstrate bad faith on the part of the government, he cannot demonstrate that Fawaz's testimony would have been material and favorable,[3] because he can offer nothing apart from his unsupported (and implausible) claim that Fawaz Damra "could have" testified that Fawaz never spoke to Damra regarding Fawaz's filing of his 1999 tax return. As an initial matter, we note that Damra had ample opportunity to interview or attempt to interview Fawaz, but did not do so. As to this point, Damra argues that he had no motive to take Fawaz's statement while Fawaz was still in the United States, and could not have taken Fawaz's deposition after Fawaz was deported because "the government does not cite any treaty or convention between the United States and the Palestinian Authority that allows the gathering of such evidence." (Damra Reply Br. at 7.) As the district court stated, however:

> [T]here is no evidence that the deportation of Fawaz deprived Alex Damra of an opportunity to interview his brother. Subsequent to his July 2006 Indictment, Alex Damra had the opportunity to seek his brother's testimony. Mr. Damra possessed the means to effect an interview of Fawaz, who at that time was in ICE custody in Monroe, Michigan. Fawaz Damra remained in custody until his deportation. Meanwhile, Mr. Damra was not in custody, but was released on bond. . . . [N]othing in the record indicates that Alex attempted to interview or uttered a desire to interview his brother as a potential witness . . . .

---

[3]Even were we applying the *McLernon* test, Damra would similarly be unable to demonstrate a violation of his right of compulsory process because he cannot demonstrate materiality and favorability.

(R. 134 at 8-9.)  Damra's argument that he could not have predicted the government's case is unavailing: Damra knew no later than when he was indicted in July of 2006 that the government was alleging that he had "caus[ed]" Fawaz to file a false tax return.  Had he wished to interview his brother, he had months to do so before Fawaz was deported in January of 2007.  As the district court observed, there is no indication that Damra *ever* sought to interview his brother.  Certainly, at any time prior to Fawaz's departure Damra could have sought to depose Fawaz.  *See* FED. R. CRIM. P. 15(a)(1) ("A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice.").  Moreover, Damra could have sought to depose his brother even after his brother's deportation.  Damra argues that there is no treaty that permits the gathering of such evidence – but, provided that a witness is willing to testify, there is no need for a treaty or convention.

At oral argument, Damra's attorney conceded that "technically, [Damra] may have had the opportunity to interview" Fawaz.  We agree, and accordingly find that Damra cannot demonstrate that Fawaz's deportation deprived him of an opportunity to interview Fawaz to determine precisely what favorable evidence Fawaz might have had to offer.  Given that Damra had an opportunity to interview Fawaz, but did not take advantage of that opportunity, Damra must instead demonstrate materiality and favorability with a plausible description of "the events to which a witness might testify, and the relevance of those events to the crime charged . . . ."  *Valenzuela-Bernal*, 458 U.S. at 871.  Despite his attempts to do so, however, Damra cannot meet this burden.  In considering Damra's supplemental motion for release pending appeal, the court stated:

> Nothing in the record under review indicates that Mr. Damra succeeds in showing that his brother's testimony would have been both material and favorable to his defense.  Counsel for the government maintains that the United States had no favorable evidence to disclose from Fawaz Damra because the potential witness had refused requests to discuss the tax investigation. Equivalently, Mr. Damra does not show how Fawaz would provide material and favorable testimony to an argument that rested on

> the Defendant's contention that the payment to his brother was a means
> of quelling family controversy.

(R. 134 at 7-8.) Damra argues that Fawaz "could have testified that filing the allegedly false tax return for himself and his wife was his own idea and that [Damra] did not instruct him to do so." (Damra Br. at 26.) This possibility, Damra maintains, "is supported by the fact that there was substantial evidence that Alex Damra paid Fawaz Damra as a return on investment and/or for Fawaz Damra to pass the money onto [sic] their father." (Damra. Br. at 26.) (At trial, under oath, Damra testified that he never spoke with Fawaz about Fawaz's taxes.) As the government correctly points out, however, Fawaz was a co-defendant who would likely have invoked his Fifth Amendment right not to testify. Fawaz, moreover, had a Motion for Separate Trial pending before the district court. Had that motion been granted, Fawaz would not have had to be at Damra's trial at all.

As Damra cannot demonstrate either that the government acted in bad faith in deporting Fawaz or that Fawaz's testimony would have been material and favorable, we hold that Damra cannot demonstrate that the government violated his Sixth Amendment right of compulsory process by deporting Fawaz before trial.

## III.

Damra's second argument is that the district court erred by finding that Fawaz's statements to Mir Ali were admissible under the hearsay exemption of FED. R. EVID. 801(d)(2)(E) as the statements of a coconspirator.[4] FED. R. EVID. 801(d)(2)(E) requires both that courts make "specific [preliminary] factual determinations and legal conclusions . . . in order for the evidence to be admitted." *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc). We review the required preliminary factual determinations (that a conspiracy existed, that the defendant was a member of the conspiracy, and that the statements were made "in furtherance of the conspiracy") for

---

[4] Damra also suggests that admission of the statements violates the Sixth Amendment's Confrontation Clause. As the district court observed, however, the Confrontation Clause only applies to "testimonial" statements, and statements made by a coconspirator "by their nature [are] not testimonial." *See Crawford v. Washington*, 541 U.S. 36, 51, 56 (2004).

clear error. *Id.* (citing *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979)). We then review *de novo* the district court's "determination that these 'facts warrant the legal conclusion under Rule 801(d)(2)(E) that the statements are admissible.'" *United States v. Young*, 553 F.3d 1035, 1047 (6th Cir. 2009) (quoting *United States v. Rogers*, 118 F.3d 466, 477 (6th Cir. 1997)).

The Federal Rules of Evidence disallow "hearsay" testimony. FED. R. EVID. 802. A statement is explicitly not hearsay, however, if it is offered against a party and it is made "by a coconspirator of a party during the course and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). In order for a statement to qualify for this exemption, the offering party must prove by a preponderance of the evidence "that the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made 'in furtherance of the conspiracy.'" *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006) (quoting *Gessa*, 971 F.2d at 1261); *see also Bourjaily v. United States*, 483 U.S. 171, 181 (1987). Courts may examine the statements in question, *Bourjaily*, 483 U.S. at 181, which must also be corroborated by independent evidence relating to the required factual determinations. *Young*, 553 F.3d at 1045 (citing *Payne*, 437 F.3d at 544).

Prior to the trial, in response to the government's motion, the district court found Fawaz's statements admissible. Damra then moved at trial for the court to exclude these statements. At the conclusion of the evidence, the district court issued a ruling, and read it into the record:

> The Court was asked to determine as a factual matter whether the prosecution has shown by a preponderance of the evidence all of the requisites for the admissibility of an unavailable co-conspirator's statements and acts. . . . The Court has received that evidence. The Court hereby concludes that the prosecution has borne its burden of proof, and finds the unavailable co-conspirator evidence introduced to the jury admissible and available for presentation to the jury under that [*sic*] Rule 801(d)(2)(E).

(Trial Tr. at 790-91.)

Damra's main argument is that there was no independent evidence that he ever told Fawaz how to treat any funds for tax purposes – what Damra refers to as "the most damaging statement" – and so the district court lacked the independent corroborating evidence required to make its preliminary factual determination under Rule 801(d)(2)(E), *see Young*, 553 F.3d at 1045.  Damra, seemingly misunderstanding the nature of the corroboration required under Rule 801(d)(2)(E), is wrongly focusing on whether there was corroboration of the *contents* of Fawaz's statements; our case law requires instead corroboration "of defendant's knowledge of and participation in the conspiracy."  *See United States v. Clark*, 18 F.3d 1337, 1341-42 (6th Cir. 1994) (finding "the independent evidence sufficiently corroborates the out of court statements to establish [the defendant's] participation in a conspiracy by a preponderance of the evidence.").

Whether there was confirmation of the contents of any one statement is not dispositive, provided that there was independent evidence offered corroborating the court's preliminary factual determinations that the conspiracy existed, that the defendant was a member of that conspiracy, and that the statements were made in furtherance of the conspiracy.[5]  *Young*, 553 F.3d at 1045.  As the government points out, there was in this case in fact significant corroborating evidence, including both Niehaus's testimony and Damra's admissions to Rasoletti (that Damra had hired Fawaz as a "consultant"; that Fawaz provided no clients and did no work; that Fawaz requested that Damra split the $100,000 between Fawaz and Fawaz's wife; and that Damra paid the money and deducted it as consulting expense on AIM's books and tax return).

As Damra has misunderstood the independent-corroborating-evidence requirement under Rule 801(d)(2)(E), and as there is (as the government points out) clearly evidence independent of Fawaz's statements corroborating the district court's conclusion that Damra was conspiring with his brother and that Fawaz's statements were made in furtherance of the conspiracy, we hold that the district court did not err in

---

[5]Damra cites the *Young* court's conclusion that "[t]he district court can consider the contents of the statement in making this determination, but the statements 'must be corroborated by independent evidence.'" 553 F.3d at 1045.  In the context of this independent evidence requirement, however, it is clear that corroborating "the statements" means corroborating what the statements themselves show – that the defendant participated in a conspiracy.  *Clark*, 18 F.3d at 1341-42.

finding that Fawaz's statements to Mir Ali were admissible at trial under FED. R. EVID. 801(d)(2)(E) as the statements of a coconspirator.

## IV.

Damra's third argument is that the district court erroneously denied his Rule 29 motion for a judgment of acquittal and his motion for a new trial, both of which were based on insufficiency of the evidence. We hold that the district court did not err in denying Damra's motions.

Given Damra's failure to renew his Rule 29 motion at the close of evidence, we review the denials of these two motions under two separate standards. "[W]hen the sufficiency of the evidence is challenged on appeal, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[.]" *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (quoting *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996)). Here, Damra filed a timely motion for a new trial on the basis that the evidence was insufficient to prove Count 1. We thus review the district court's denial of Damra's motion for a new trial under the "any rational trier of fact" standard. In his motion for a new trial, Damra focused only on the sufficiency of evidence going to Count 1, the charge of conspiring to defraud the United States.

A properly preserved Rule 29 motion for a judgment of acquittal is similarly reviewed under the "any rational trier of fact" standard. A Rule 29 motion is properly preserved for appeal when a defendant makes a "motion for acquittal at the end of the prosecution's case-in-chief and at the close of evidence." *Kuehne*, 547 F.3d at 696 (quoting *United States v. Chance*, 306 F.3d 356, 368-69 (6th Cir. 2002)). While Damra correctly moved for acquittal pursuant to Rule 29 at the close of the government's evidence, he failed to renew his motion at the close of evidence. "Failure to make the required motions constitutes a waiver of the objections to the sufficiency of the evidence." *Id.* Where there has been a waiver, we are limited in reviewing the sufficiency of evidence to determining whether there has been a "manifest miscarriage of justice." *Id.* (quoting *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)).

"Under this standard, 'we only reverse a conviction if the record is devoid of evidence pointing to guilt.'" *Id.* (quoting *Carnes*, 309 F.3d at 956).

In arguing that the evidence was insufficient to support his conviction, Damra argues that Ali's testimony was "incoherent," and that – apart from Ali's testimony – there was no independent evidence of a conspiracy between Damra and Fawaz. In response, the district court stated:

> The gist of Alex Damra's insufficiency argument rests on two precarious assumptions: that Mr. Ali's testimony alone provided "the crucial link" establishing a conspiracy between the defendant and his brother; and, that Mr. Ali's testimony was "not credible" in sustaining the evidence. Neither of those assumptions bear the weight of scrutiny.
>
> The Court finds the documentary and testimonial evidence sufficient to provide the basis upon which the jury could reasonably reach its verdict to convict Alex Damra on the conspiracy Count. Mr. Ali's testimony assisted in the accumulation of that evidence. However, even discounting Mr. Ali's testimony entirely, the remaining evidence is so substantial that it does not present that "extraordinary circumstance" where the evidence "preponderates heavily against the verdict."
>
> For instance, the evidentiary weight of Alex Damra's several admissions to Special Agent Gary Rasoletti . . . .
>
> *         *         *
>
> The jury heard testimony that Alex Damra admitted to Agent Rasoletti on 7 February that his brother approached the defendant with an offer to steer wealthy mosque members toward Alex Damra's business, AIM. Alex Damra further admitted that he typically paid a person who brought him new business 10 to 15 percent of the value of that new business as a consulting fee. Alex Damra further recounted that toward the end of 1999 his brother sought payment of $60,000 as a consulting fee which the defendant refused to pay telling his brother he had generated no contracts. Alex Damra then recounted that he received family pressure to pay his brother money which, he admitted, his brother had not earned. The Court heard testimony that despite having received no consulting services either from his brother or his brother's wife, Alex Damra admitted to sending each a $50,000 check, an amount which he then deducted from AIM's corporate tax return as a consulting fee.
>
> The jury heard further testimony from Agent Rasoletti of admissions made by Alex Damra during his 21 April 2005 interview with the defendant in Las Vegas. . . . Rasoletti recounted that Alex Damra

admitted to sending money to his brother Nader Damra and labeling the payments as consulting work. Alex Damra admitted to Agent Rasoletti that he had "mishandled the money," and that there was "abuse" in classifying the payments made for consulting work performed. The jury further heard the following colloquy from Agent Rasoletti on direct examination from the government:

Q. At that point in the interview did you tell Alex Damra your investigative conclusions?

A. Yes.

Q. What did you tell him?

A. I told him that according to his '98 [*sic*]-'97 and '98 tax return, he had only made $20,000 as taxable income, and that the only way he could afford to send money overseas to his brother was, in fact to get it out of the company and to use the company in this fashion, because he did not have the funds available; otherwise, he couldn't have sent this money overseas.

Q. He agreed with you?

A. Yes.

Q. Did you ask him again at that point about the two $50,000 checks to Fawaz and Nesreen?

A. Yes.

Q. Did you ask him if Fawaz had dome any work for AIM?

A. He – yes, and he responded that Fawaz had not done $5 worth of work for AIM.

Q. Had not done $5 worth of work?

A. For AIM, that's correct.

Q. Did you ask if Fawaz, Nesreen, and/or Nader were employees of AIM?

A. I did, and he said they were not employees of AIM.

Q. Did you make the statement as to using AIM as a vehicle?

A. Yes. He said, "I will accept responsibility."

\*      \*      \*

> With regard to the credibility of Mr. Ali's testimony . . .  A review of the transcript also reveals that . . . Ali credibly maintained the central thread of his testimony, that Fawaz Damra told him that he wanted to report the receipt of $100,000 from Alex Damra, not for work performed, but instead, to allay Alex Damra's tax burden as he was in a higher tax bracket. . . . [T]he witness testified clearly that Mr. Damra's brother told the witness that Alex Damra had given him the money, that it would help reduce Alex Damra's taxes, and that Fawaz Damra provided no proof that the money was earned.  Mr. Ali further testified that as a result of Fawaz Damra's admissions he refused to complete the 1999 tax return.

(R. 103 at 6-10 (citations omitted).)

In his appeal, Damra entirely ignores the district court's conclusion that – even without Ali's testimony – Damra's admissions to Rasoletti alone were sufficient to support the conviction.  As the district court concluded, moreover, there is no reason to ignore Ali's testimony, despite the difficulties that arose during Ali's direct and cross-examinations.  Regardless, Damra's focus on whether there was evidence of an explicit agreement between him and Fawaz, or whether there was evidence that Damra told Fawaz how to file *Fawaz's* tax return, is misplaced, as a defendant's agreement to participate in a conspiracy can be inferred from his actions.  *See United States v. Warman*, 578 F.3d 320, 332 (6th Cir. 2009) ("The existence of a conspiracy 'may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'") (quoting *U.S. v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)).

Because, any rational trier of fact, viewing the evidence in the light most favorable to the prosecution could have found the essential elements of both Counts (and thus, necessarily, that the record was not devoid of evidence of guilt), we find that the district court did not err in denying Damra's motions for a judgment of acquittal and a new trial.

**V.**

Damra's fourth argument is that the district court erred by assigning Agent Rasoletti, the lead criminal investigator and a key prosecution witness, to "interpret" for Mir Ali, another critical prosecution witness.  A court's decision regarding whether to appoint an interpreter or facilitator in part falls under FED. R. EVID. 611(a), which states that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Ordinarily, "[u]nder Rule 611 . . . a judge's rulings will not be the basis for reversal of a criminal conviction unless a defendant's substantial rights are affected." *United States v. Terry*, 729 F.2d 1063, 1067 (6th Cir. 1984).  As Damra never objected to the court's appointment of Rasoletti to facilitate Mir Ali's testimony, we review for plain error. Plain error review involves four prongs:

> First, there must be an error or defect – some sort of "[d]eviation from a legal rule" – that has not been intentionally relinquished or abandoned . . . .  Second, the legal error must be clear or obvious, rather than subject to reasonable dispute.  Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the district court proceedings."

*Puckett v. United States*, --- U.S. ----, 129 S. Ct. 1423, 1429 (2009).  Fourth, if these three prongs are satisfied, then the court "has the *discretion* to remedy the error – discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (emphasis in original).

As the district court later noted, there were some difficulties with Mir Ali's testimony:

> [T]he transcript bears witness to some difficulty predicated on hearing loss and language differences.  The Court made some changes the second day of testimony to accommodate these difficulties, including situating Mr. Ali so that he might hear better and placing Special Agent Rasoletti nearby to, when necessary, repeat Alex Damra's questions during the defendant's cross examination. . . . [A] review of the transcript indicates

> Agent Rasoletti's high degree of fidelity in accurately reproducing the defendant's questions to Mr. Ali.

(R. 103 at 9-10.) There is no indication that Damra objected to Rasoletti's role (as opposed to Mir Ali's testimony). The record does, however, indicate that Ali often could not be heard or understood, and the court reporter in those instances instead relied upon Rasoletti's echoing of Ali's words.

As an initial matter, we conclude that Rasoletti's appointment falls under FED. R. EVID. 604, which broadly governs interpreters. Not only did the district court twice refer to Rasoletti as "the interpreter," but the court and the court reporter both depended upon Rasoletti to transmit accurately answers that they otherwise could not hear or understand.[6]

Given that Rasoletti's appointment falls under Rule 604, and thus implicates the case law addressing that Rule, it seems equally clear that the district court erred in appointing Rasoletti. "[T]he law contemplates that a fair, impartial, and correct interpretation shall be had, and to this end, a disinterested interpreter should be provided if possible . . . ." *Prince v. Beto*, 426 F.2d 875, 877 (5th Cir. 1970) (quoting *Almon v. State*, 109 So. 371, 372 (Ala. Ct. App. 1926)). Rasoletti, the lead criminal investigator, actually sat at the prosecution table and was introduced to the jury as the man whose investigation "brought us here today." In *Prince*, where the district court appointed a husband to interpret for his wife in the criminal trial of her alleged attempted rapist, the Fifth Circuit condemned the court's actions. "[W]e cannot approve the action of the state trial court," the *Prince* court wrote. "One can imagine few situations in which there would be a greater potential for bias by an interpreter." *Prince*, 426 F.2d at 877. Surely,

---

[6]The government argues that Rasoletti was not an interpreter within the meaning of Rule 604 because Ali was testifying in English and so Rasoletti did not need to translate from (or qualify to translate from) another language. Rule 604, however, does not apply only to those who interpret from other languages into English. The notes to Rule 604 indicate that the Rule implements FED. R. CRIM. P. 28. According to an Advisory Committee Note for FED. R. CRIM. P. 28, "Interpreters may also be needed *where a witness or a defendant is deaf*." The Court Interpreters Act, 28 U.S.C. § 1827 (emphasis added), moreover, makes provision for interpreters "for the hearing impaired (whether or not also speech impaired) . . . ." 28 U.S.C. § 1827(b)(1). Here, the district court intended Rasoletti to help communicate questions to Ali, who was hard of hearing, and communicate Ali's sometimes indecipherable responses to the parties, the court reporter, and the jury.

one such situation is where the lead criminal investigator in a case is assigned to interpret for an important prosecution witness.

While the court erred, however, Damra has not alleged, and cannot demonstrate, that the error "affected the outcome of the district court proceedings." *Puckett*, 129 S. Ct. at 1429. Put another way, the error did not affect Damra's substantial rights – and so would not even rise to abuse of discretion in the Rule 611 context, had Damra objected at trial to Rasoletti's appointment and thus avoided plain-error review. *See Terry*, 729 F.2d at 1067. The transcript clearly demonstrates that (as the district court observed) Ali "credibly maintained the central thread of his testimony," (R. 103 at 9-10) – both while being cross-examined by Damra (and aided by Rasoletti) and while being asked questions on direct examination the previous day, *before* Rasoletti was appointed. Accordingly, while the district court erred in appointing Rasoletti to interpret for Ali, we hold that the district court in this case did not commit *plain* error in doing so.

## VI.

In a fifth argument, Damra alleges that the district court erred in issuing jury instructions as to Count 1, the charge of conspiring to defraud the United States in violation of 18 U.S.C. § 371. While the prosecution must prove that a defendant acted "willfully" in order to convict that defendant under this statute, Damra argues, the district court here instead instructed the jury that the prosecution needed to prove that Damra had "knowingly and voluntarily" joined the conspiracy. In other words, Damra is arguing that there is a such a great distinction between "willfully" on the one hand and "knowingly and voluntarily" on the other as to render his conviction on Count 1 improper. As Damra concedes that he failed to object to the instructions at trial, we review for plain error.

"When jury instructions are claimed to be erroneous, we review the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Russell*, 595 F.3d 633, 642 (6th Cir. 2010) (quoting *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005)). "A judgment may be reversed

based upon an improper jury instruction 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'" *Id.* (quoting *Kuehne*, 547 F.3d at 669). "It is clear that omitting instructions that are . . . [related] to elements that go to the question of guilt or innocence is plain error." *Glenn v. Dallman*, 686 F.2d 418, 421 n.2 (6th Cir. 1982). We have previously found willfulness to be a required element of § 371 conspiracy:

> To establish a conspiracy, in violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt that there was "an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." This requirement has been broken down into a four-part test, which requires the government to prove that: "1) the conspiracy described in the indictment was wilfully [sic] formed, and was existing at or about the time alleged; 2) the accused willfully [sic] became a member of the conspiracy; 3) one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time and place alleged; and 4) that overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged."

*United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004) (citations omitted). The question, then, is whether by instructing the jury that Damra had "knowingly and voluntarily" participated in the conspiracy the district court was in effect omitting the required willfulness element of the crime.

In arguing that the district court omitted a required instruction, Damra insists that the Supreme Court "has explicitly held that mere knowing and intentional conduct is insufficient to satisfy the 'willfulness' standard." (Damra Br. at 37.) In support, Damra cites *United States v. Bishop*, 412 U.S. 346, 352 (1973), in which the Court, quoting an earlier case, observed:

> The difference between willful failure to pay a tax when due, which is made a misdemeanor, and willful attempt to defeat and evade one, which is made a felony, is not easy to detect or define. Both must be willful, and willful, as we have said, is a word of many meanings, its construction often being influenced by its context. . . . Mere voluntary and purposeful, as distinguished from accidental, omission to make a timely return might meet the test of willfulness. But in view of our traditional aversion to imprisonment for debt, we would not without the

clearest manifestation of Congressional intent assume that mere knowing and intentional default in payment of a tax, where there had been no willful failure to disclose the liability, is intended to constitute a criminal offense of any degree.

*Bishop*, 412 U.S. at 352 (quoting *Spies v. United States*, 317 U.S. 492, 497-98 (1943)).

In instructing the jury, the district court had this to say regarding the conspiracy charge:

> A conspiracy is a kind of criminal partnership. For you to find the defendant guilty of the conspiracy charge in Count 1, the government must prove each and every one of the following elements beyond a reasonable doubt: First, that two or more persons conspired or agreed to commit the crime of tax fraud. Second, that the defendant knowingly and voluntarily joined the conspiracy. And third, that a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.
>
> \* \* \*
>
> If you're convinced that there was a criminal agreement, then you must decide whether the government has proved that the defendant knowingly and voluntarily joined that agreement.
>
> To convict the defendant, the government must prove that he knew the conspiracy's main purpose, and that he voluntarily joined it, intending to help advance or achieve its goals.
>
> \* \* \*
>
> What the government must prove is that the defendant knew the conspiracy's main purpose and that he voluntarily joined it intending to help it advance or achieve its goals.

(Trial Tr. at 810-813.)

While Damra is correct that the district court did not explicitly mention "willfulness," but instead discussed whether Damra had participated "knowingly and voluntarily," in fact the district court's instruction here mirrors our circuit pattern jury instructions. Sixth Circuit Pattern Jury Instructions, § 3.01B *Conspiracy to Defraud the United States – Basic Elements* ("[T]he government must prove that the defendant knowingly and voluntarily joined the conspiracy."). We regularly look to whether jury

instructions mirror or track the pattern instructions as one factor in determining whether any particular instruction is misleading or erroneous. *See, e.g., United States v. Blackwell*, 459 F.3d 739, 765 (6th Cir. 2006) ("As a comparison of the two instructions evidences, only one sentence of the second portion of the trial court's instruction differs from the pattern jury instructions. Thus, without more, we cannot say that the trial court's instruction was either misleading or erroneous."); *United States v. Hines*, 398 F.3d 713, 718 (6th Cir. 2005) ("Here, the instructions on conspiracy were not plainly erroneous. The district court's instructions essentially tracked the language and organization of the Sixth Circuit Pattern Jury Instruction regarding conspiracy."); *see also United States v. Katuramu*, 174 F. App'x 272, 279 (6th Cir. Mar. 28, 2006) ("[T]his court has routinely found that instructions are not plainly erroneous where they track the circuit's pattern jury instructions.").

In our case law, moreover, we have repeatedly approved this exact "knowingly and voluntarily" formulation of describing conspiracy. *See, e.g.*, *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000) ("The government, however, must show that a particular defendant knew the object of the conspiracy and 'voluntarily associated himself with it to further its objectives.'" (quoting *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999))); *Gibbs*, 182 F.3d at 421 ("To be found guilty of conspiracy, the government must prove that [the defendant] was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives." (quoting *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991))).

The Supreme Court in *Bishop* admittedly distinguished – at least in the context of tax default by confused taxpayers –"willful" behavior on the one hand from "knowing and intentional" default on the other. 412 U.S. at 352. In instructing the jury in this case, however, the district court stated that the government needed to prove that Damra had joined the conspiracy "knowingly and *voluntarily*" – not, as discussed in *Bishop*, "knowing[ly] and intentional[ly]." Damra's argument thus rests on the assumption that "voluntary" action is the same thing as "intentional" action, and that knowledge and voluntariness are not the same thing as "willfulness." "Willful," however, is defined by at least one dictionary as "voluntary and intentional, but not necessarily malicious."

BLACK'S LAW DICTIONARY (8th ed. 2004).  More importantly, the *Bishop* Court itself
observed that "[t]he Court, in fact, has recognized that the word 'willfully' . . . generally
connotes a *voluntary, intentional* violation of a known legal duty.  It has formulated the
requirement of willfulness as 'bad faith or evil intent' . . . ."  412 U.S. at 360 (emphasis
added) (quoting *United States v. Murdock*, 290 U.S. 389, 398 (1933)); *see also Cheek
v. United States*, 498 U.S. 192 (1991) ("[W]e described the term 'willfully' as connoting
'a voluntary, intentional violation of a known legal duty . . . .'") (citation omitted).

As the district court's instructions tracked our pattern instructions, as we have
repeatedly approved of the "knowingly and voluntarily" formulation of the second
element of conspiracy to defraud the government under 18 U.S.C. § 371, and as "willful"
is in fact defined in part as "voluntary," we find that the district court did not omit the
willfulness element of § 371 conspiracy when it instructed the jury, and so did not
commit plain error in issuing its instructions as to Count 1.

## VII.

Damra next argues that in issuing jury instructions as to Count 2, the charge of
corporate tax evasion in violation of 26 U.S.C. § 7201, the district court erred by not
issuing three types of instructions: first, an instruction stating that the government bears
the burden of negating Damra's good faith (a "good faith" instruction)[7]; second, an
instruction stating that the jury must unanimously find that both of the affirmative acts
alleged in the indictment in fact occurred (a "unanimity" instruction); and third, an
instruction informing the jury that it needed to find that Damra had committed some
affirmative act after July 25, 2000 (a "statute of limitations" instruction).  As Damra

---

[7]Damra also suggests that a good faith instruction was required in the instructions as to Count
1.  The case on which Damra is relying, however, addresses only tax evasion, and not conspiracy to
defraud the government.  *See Cheek v. United States*, 498 U.S. 192 (1991).  As we have held, moreover,
"The intent element of § 371 does not require the government to prove that the conspirators were aware
of the criminality of their objective . . . ." *United States v. Khalife*, 106 F.3d 1300, 1303 (6th Cir. 1997)
(quoting *United States v. Collins*, 78 F.3d 1021, 1038 (6th Cir. 1996)).

failed to make these three arguments before the district court, we again review for plain error.[8]

## A. Good-Faith Instruction

Damra argues that the court needed to instruct the jury that the government bears the burden of negating Damra's good faith, because, in considering whether a defendant's actions in evading taxes were "willful," a jury must consider (and the court must instruct the jury to consider) the defendant's good faith belief that he is not violating the tax laws as part of that inquiry. For this principle, Damra cites *Cheek*. In *Cheek*, the defendant, who was on trial for tax evasion, argued that while he had not filed tax returns, he had not acted willfully because he sincerely believed that his actions were lawful. 498 U.S. at 195-97. The district court instructed the jury that an honest but unreasonable belief does not negate willfulness. *Id.* at 196-97. The Supreme Court reversed, stating:

> Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty. We deal first with the case where the issue is whether the defendant knew of the duty purportedly imposed by the provision of the statute or regulation he is accused of violating, a case in which there is no claim that the provision at issue is invalid. In such a case, if the Government proves actual knowledge of the pertinent legal duty, the prosecution, without more, has satisfied the knowledge component of the willfulness requirement. But carrying this burden requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws.

*Id.* at 201-02.

---

[8]While Damra maintains that he preserved his argument relating to the statute of limitations issue by repeatedly attempting to argue it before the jury and the district court, and that accordingly we should review for abuse of discretion rather than plain error, Damra clearly did not preserve any statute of limitations objection *as to the jury instructions*. In disagreeing over whether Damra waived the statute-of-limitations argument, both parties here are conflating two issues: the question of whether Damra objected to the district court's legal conclusion that the statute of limitations did not bar the prosecution (which he did) and the more important (for this purpose) question of whether Damra objected to the district court's failure to issue a statute-of-limitations instruction (which he did not). Damra never attempted to argue that the court should include a statute-of-limitations instruction, and also twice – once explicitly – declined to object to the jury instructions.

Responding to Damra's argument regarding the good-faith instruction, the district court stated:

> Alex Damra did not merely fail to request a good faith defense jury instruction, he failed, in the presentation of his defense as well as in the tenor of his cross-examinations to assert a misunderstanding of the law as a good faith defense. . . .  Of Alex Damra's several assertions in defense, none of them could be characterized as "good faith misunderstanding of the law."  Instead, the defendant asserted variously that his brother was a consultant, that his brother's wife was a consultant, that the $100,000 payment was a return on his brother's alleged 1993 investment in AIM, that the money was for his family in the Middle East, that the government's prosecution of him was motivated by their effort to convict his brother, and that he had actually overpaid his taxes. Nothing in the defendant's claim sought to negate the "known legal duty" to properly declare the monies provided his brother, his brother's wife, and family members.

(R. 103 at 15-16.)

Damra disputes the district court's finding that he failed to argue at trial that he acted in good faith, and so asserts that the district court left the jury "with no road map regarding how" good faith evidence should be considered.  Even assuming that Damra did indeed argue that he acted in good faith, however – an assumption that may not be warranted, given Damra's several and shifting explanations for why he gave Fawaz the money – the district court was in any event not required to give a good-faith instruction. As the Supreme Court has held, where a trial judge "adequately instructed the jury on willfulness" in a case concerning whether the defendants had filed fraudulent tax returns, "[a]n additional instruction on good faith was unnecessary." *United States v. Pomponio*, 429 U.S. 10, 13 (1976).  Willfulness, the Court explained, "in this context simply means a voluntary, intentional violation of a known legal duty." *Id.*  The clear implication of *Pomponio* is that where a district court presiding over a criminal tax-evasion case issues an instruction defining willfulness in this fashion, the good-faith requirement is effectively bundled into the willfulness instruction.  Here, the district court instructed the jury that in order to sustain its burden of proof as to Count 2, "the government must prove beyond a reasonable doubt that defendant acted willfully.  To act willfully means

to act voluntarily and deliberately, and intending to violate a known legal duty." (Trial Tr. at 816-17.) By matching the language approved of in *Pomponio*, the district court effectively and correctly instructed the jury as to this element.[9] As we have explicitly held, moreover, a jury's conclusion that a defendant acted "willfully" in this manner "would necessarily negate any possibility" that the defendant acted in good faith. *United States v. Tarwater*, 308 F.3d 494, 510 (6th Cir. 2002); *see also United States v. Ervasti*, 201 F.3d 1029, 1041 (8th Cir. 2000) (holding that the district court did not abuse its discretion in refusing the defendant's request for a good-faith instruction where the court instructed the jury that "[a]n act is done willfully if it is done voluntarily and intentionally with the purpose of violating a known legal duty.").

As the district court issued a fully sufficient *Pomponio* instruction, we find that the district court did not err by not issuing a good-faith instruction as to Count 2.

### B. Augmented Unanimity Instruction

Damra argues that, as one of the two affirmative acts alleged in Count 2 of the indictment occurred more than six years before the filing of the indictment (and so arguably outside the statute of limitations period), the district court erred by failing to instruct the jury that it must unanimously find that both affirmative acts in fact occurred.

According to the indictment as to Count 2:

From on or about April 20, 2000, and continuing through at least August 7, 2000 . . . [Damra] did willfully attempt to evade and defeat a large part of the income tax due and owing by [AIM] to the United States of America for the calendar year 1999, in the approximate amount of $184,788, (a) by filing and causing to be filed a false and fraudulent Form 1120 for AIM for 1999 which falsely deducted as business expense funds paid to himself and family members, ***and*** (b) by causing a portion of those funds paid to his brother, Fawaz Damra (not a defendant in this

---

[9] Damra argues that *Pomponio* is distinguishable, because – as the jury in that case was instructed to determine whether certain transactions were "bona fide loans" – the issue of the *Pomponio* defendant's good faith "was already embodied in the trial court's instruction regarding the specifics of the transaction." The Court in *Pomponio*, however, in no way indicated that the question of whether transactions were "bona fide loans" had anything to do with its judgment that the good faith instruction was not necessary where the district court appropriately and adequately instructed the jury as to willfulness.

Count) to be falsely reported as Schedule C gross receipts on the Form 1040 filed jointly by Fawaz Damra and his wife for the year 1999.

(R. 1 at 8 (emphasis added).) In instructing the jury, the district court stated: "This is a criminal case, which requires a unanimous verdict. . . . To find Fayez Alex Damra guilty, every one of you must agree . . . . Either way, guilty or not guilty, your verdict must be unanimous." (Trial Tr. at 880-81.)[10]

Damra argues that by failing to issue a unanimity instruction as to Count 2, the district court created the possibility that the jury might have rendered a "patchwork" verdict – in other words, that the jury might have convicted Damra with half of the jurors concluding that only the first affirmative act happened and the other half concluding that only the second affirmative act occurred. In support, Damra points to our decision in *United States v. Duncan*, 850 F.2d 1104, 1105 (6th Cir. 1988), *overruled on other grounds by Schad v. Arizona*, 501 U.S. 624 (1991), in which we vacated a defendant's conviction because, where a jury was presented with arguments that two separate and distinct statements in a tax return were false, "[t]he structure of the indictment and ambiguous instructions given by the judge . . . combined to create a substantial likelihood of jury confusion, with the result that it is unclear which of the statements the jurors found to be false and whether their verdict on either was unanimous." In summing up its general holding, the *Duncan* court stated that "[w]hen distinct proof is required to establish distinct affirmative acts as elements of an offense, specific unanimity is necessary." *Id.* at 1113. Seizing upon this language, Damra argues that the indictment in his case was analogous to the conjunctive indictment in *Duncan*, and that here, as there, the jury could have rendered a guilty verdict without unanimity as to a single affirmative act.

In relying on *Duncan*, however, Damra ignores at least two critical differences between that case and this one. The first is that in *Duncan* the defendants had been

---

[10]The district court issued a statute-of-limitations instruction as to Count 1, but did not issue a statute of limitations instruction or a unanimity instruction specifically as to Count 2. As to Count 1, the court said: "For you to return a guilty verdict on the conspiracy charge, the government must convince you beyond a reasonable doubt that at least one overt act was committed for the purpose of advancing or helping the conspiracy after 25 July 2000." (Trial Tr. at 814.)

convicted of violating 26 U.S.C. § 2706(1) and 2706(2), which prohibit the making and preparation of a tax return containing a false statement as to a material matter. *Id.* at 1105.  In this case, in contrast, Damra was convicted of tax evasion under 26 U.S.C. § 2701.  In *Duncan*, the indictment – though stated in the conjunctive – alleged that the defendant had made two *separate and distinct* false statements, either one of which would have been sufficient to justify conviction under § 2706.  In contrast, § 2701 is written more broadly – as the *Duncan* court itself explicitly recognized.  *See id.* at 1112 n.8 ("If this were a prosecution for tax *evasion* under 26 U.S.C. § 2701, the reasoning would be different.  The gist of a tax evasion charge is willful evasion of tax by filing a return that may involve multiple complex understatements or omissions made in the course of continuing conduct.") (emphasis in original).  As the district court stated, "[t]he two affirmative acts enunciated in Count 2 were properly presented to the jury as collectively essential in the Indictment itself, in the arguments and evidence presented to the jury, and in the jury instructions."  (R. 114 at 18.)  In other words, the affirmative acts alleged in Count 2 of Damra's indictment were not separable; the charge was that Damra, by doing *both* of them, had willfully evaded paying required tax.  Given that the indictment was stated in the conjunctive, the district court did not err by not giving an augmented unanimity instruction.

The second critical difference between *Duncan* and this case goes to the question of whether, even if the district court erred by failing to give an augmented unanimity instruction, the court committed plain error.  In *Duncan*, we explicitly held that the defendant's sentence should be vacated because the district court had ignored prompts from both the defendants and the jury suggesting that the jury would be or was confused on this point:

> We hold that due to a number of factors – including pretrial motions specifically pointing out the problem and a mid-deliberation question from the jury raising a genuine possibility that conviction could occur as the result of different jurors using a different false statement as the underlying factual predicate for guilt – the District Court was sufficiently apprised of the specific unanimity problem that it should have given an augmented instruction that the jurors must all agree on the willful falsity of at least one, and the same one, false statement.

*Duncan*, 850 F.2d at 1105.  As we explained, our conclusion that the defendant's sentence needed to be vacated was due to special circumstances.  The general rule, we observed, is that only a general unanimity instruction is required even where an indictment count provides multiple factual bases under which a conviction could rest, unless: "(1) the nature of the evidence is exceptionally complex or the alternative specifications are contradictory or only marginally related to each other; or (2) there is a variance between indictment and proof at trial; or (3) there is tangible indication of jury confusion, as when the jury has asked questions or the court has given regular or supplementary instructions that create a significant risk of nonunanimity."  *Id.* at 1113-14.  The "touchstone has been the presence of a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts."  *Id.* at 1114.  In this case, in contrast to *Duncan*, there was no reason to suspect that the jury was in any way confused, or that there could have been a patchwork verdict.  Accordingly, even if the district court's failure to give an augmented unanimity instruction constituted error, it surely did not constitute plain error, as it did not affect Damra's substantial rights.  *See Puckett*, 129 S. Ct. at 1429.

As the indictment was stated in the conjunctive, and the affirmative acts alleged in Count 2 wee presented to the jury as collectively essential, we hold that an augmented unanimity instruction was not required, and therefore the court did not commit plain error in failing to provide one.

### C.  Statute of Limitations Instruction

Damra argues that the district court erred by not informing the jury that it needed to find that Damra had committed some affirmative act after July 25, 2000.  The statute of limitations for tax offenses is six years, 26 U.S.C. § 6531, and is triggered by the last affirmative act of evasion in furtherance of the crime.  *United States v. Dandy*, 998 F.2d 1344, 1355 (6th Cir. 1993).  The indictment was returned on July 25, 2006.  There is no question here but that the second affirmative act alleged in the indictment – the false reporting of income in Fawaz's tax return, which was mailed on August 3, 2000 and which was received by the IRS on August 7, 2000 – fell within the statute-of-limitations

period.  Damra's argument is that, in the absence of a statute-of-limitations instruction as to Count 2, it is impossible to know whether the jury convicted Damra of tax evasion without unanimously agreeing that, within the statute-of-limitations period, he in fact "caus[ed] a portion of those funds paid to [Fawaz] . . . to be falsely reported . . . ."  (R. 1 at 8.)

Damra's argument here rests on the same basis as does his argument that the jury might have rendered a "patchwork" verdict in the absence of an augmented Count 2 unanimity instruction.  It fails for the same reason: in order to convict Damra on Count 2, the jury had to find that both of the affirmative acts alleged in the indictment occurred, and thus had to find that Damra caused the funds to be falsely reported within the statute of limitations period.  As the district court explained:

> The two affirmative acts enunciated in Count 2 were properly presented to the jury as collectively essential in the Indictment itself, in the arguments and evidence presented to the jury, and in the jury instructions.  The earliest possible culmination of this section 7201 evasion was Alex Damra's brother's posting to the IRS of his, agreed to, false Schedule C filing on 3 August 2000.  The jury, understandably, did not require an instruction on the statute of limitations.  If the jury was convinced by the evidence of the affirmative acts of Count 2 then the Indictment was within the necessary six-year time frame.  If the jury was not convinced by the evidence, the issue of the statute of limitations would have been rendered moot.

(R. 114 at 18.)

Accordingly, as in finding Damra guilty of tax evasion, the jury must have concluded that both affirmative acts alleged in the Count 2 indictment occurred, we hold that the district court did not err in not issuing a statute of limitations instruction as to Count 2.

## VIII.

Damra's next argument is that his conviction for conspiracy to defraud the United States must be vacated because Count 1 of the indictment, alleging that Damra conspired to defraud the United States, fails to allege an offense pursuant to 18 U.S.C.

§ 371, as Damra could in fact only be charged under § 371 with conspiring to *commit any offense against* (rather than to defraud) the United States.  We review the sufficiency of an indictment *de novo*.  *Kuehne*, 547 F.3d at 695.

18 U.S.C. § 371 contains both a "conspiracy to commit an offense" clause and a "conspiracy to defraud" clause.  *See Khalife*, 106 F.3d at 1302.

> If two or more persons conspire either to commit any offense against the United States ["offense" clause], or to defraud the United States, or any agency thereof in any manner or for any purpose ["defraud" clause], and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned . . . .

18 U.S.C. § 371.  Damra cites *United States v. Minarik*, 875 F.2d 1186 (6th Cir. 1989), in which we held that "an individual whose alleged wrongful agreement is covered by the offense clause (because covered by a specific offense defined by Congress), as well as arguably by the broad defraud clause, cannot be convicted or punished for both. Only by treating conspiracies to commit specific offenses (which are also arguably general frauds) exclusively under the offense clause of § 371 can multiple convictions and unnecessary confusion be avoided."  *Id.* at 1193-94.  Damra, relying on this holding, argues that Count 1 was not a proper charge pursuant to § 371 because Count 1 involves only his evasion of taxes and no other crime, and so he could be charged only under the "offense" clause, and not the "defraud" clause, and Count 1 alleged a conspiracy to *defraud*, rather than commit an offense.

The district court identified both the dispositive issue and applicable law on this question:

> In *Minarik*, the Court determined that "the 'offense' and 'defraud' clauses as applied to the facts" are to be considered "mutually exclusive." *Minarik*, 875 F.2d 1187.  The legal significance of this distinction was pointed out in *United States v. Khalife*, 106 F.3d 1300, 1303 (6th Cir. 1997) . . .  However, even after acknowledging the distinctions between the 'offense' and 'defraud' clauses, the Court in *Khalife* recognized that "the *Minarik* requirement of mutual exclusivity is dicta" as "the law in this circuit does not require . . . that the conspiracy be charged under only the 'offense' clause of § 371." *Id.* at 306.

* * *

In the wake of *Minarik*, the Sixth Circuit, while never overruling the holding, has nevertheless, confined the decision to its facts. *See United States v. Sturman*, 951 F.2d 1466, 1473-74 (6th Cir. 1991); *United States v. Mohney*, 949 F.2d 899, 902-905 (6th Cir. 1991); *United States v. Kraig*, 99 F.3d 1361, 1367-68 (6th Cir. 1996); *United States v. Khalife*, 106 F.3d at 1305-06. In *Minarik*, the defendants allegedly conspired to conceal assets upon which the IRS may have been entitled to levy. *Minarik* focused on the narrow purpose of the conspiracy – preventing the IRS from levying on funds earned from the sale of a house – as arising from a single event and prohibited by a single statute. Further, the bill of particulars contained two separate theories of criminal liability, while the second theory, of tax evasion, could not have been predicted from the indictment.

Whether *Minarik* is controlling in the instant matter, then, turns on the degree to which the facts of this case mimic the circumstances found in *Minarik*. The *Khalife* Court recognized the following:

> First, there was a great deal of confusion resulting from the government's shifting theories of prosecution and failure to clearly define the intent element in the indictment. The one-count indictment in *Minarik* vaguely charged the defendants with conspiring "to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Department of the Treasury."
>
> Second, the *Minarik* defendants' conduct consisted of one limited act of concealing the proceeds of a real estate transaction to prevent a levy upon the proceeds by the IRS. The breadth of the activity was not commensurate with the *Minarik* court's conception of a general conspiracy to defraud.
>
> Third, the *Minarik* defendants' duties were sufficiently technical to warrant more specific notice . . . .

*Khalife*, 106 F.3d at 1304. In short, *Minarik* applies only when the defendant receives no specific notice of the crimes charged, the violation was too isolated to comprise a conspiracy to defraud, and the taxpayer's duties are technical. . . .

The factual circumstances of this case do not fit within the ambit of *Minarik*. First, unlike the circumstances in *Minarik*, Mr. Damra received specific notice of the crimes charged as the government delineated the manner and means of the conspiracy and the overt acts comprising the

alleged conspiracy in Count 1 of the Indictment.    Unlike the circumstances in *Minarik*, in which the government shifted its theory of the case several times, in this instance the government maintained a consistent theory predicated on Count 1 of the Indictment and argued at trial, of a conspiracy involving Alex Damra of failing to properly disclose or account for monies provided to Damra family members. . . . Second, unlike the factual circumstances in *Minarik*, Mr. Damra's alleged conspiratorial conduct extended beyond filing a false tax return, to encompassing a broader conspiracy to improperly account for monies sent to family members here in the United States and abroad.  Because the conspiracy implicated a variety of statutes, the instant case is distinguishable from *Minarik*.  Third, distinct from the technical, pre- and post-levy disclosure requirements in *Minarik*, Mr. Damra's duties were neither difficult nor technical.

(R. 114 at 3-8).

As we have concluded in other cases in which defendants have made this argument, "[b]ecause the unique circumstances found in *Minarik* do not apply here, we decline to depart from the general rule that the defraud and offense clauses are not mutually exclusive." *See United States v. Tipton*, 269 F. App'x 551, 556 (6th Cir. 2008). Accordingly, we find that Damra could appropriately be charged under § 371's "defraud" clause, and that therefore Count 1 does not fail to allege an offense pursuant to 18 U.S.C. § 317.

**IX.**

Damra next argues that the district court miscalculated his offense level, and so improperly sentenced him at level 16 instead of level 15.  In reviewing a sentence, the appeals court "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range . . . or failing to adequately explain the chosen sentence . . . ." *Gall v. United States*, 552 U.S. 38, 51 (2007).  Where "the district court materially erred by failing to calculate the appropriate guideline range," we are required to remand for re-sentencing. *United States v. Novales*, 589 F.3d 310, 314 (6th Cir. 2009).  Both Damra and the government appear to agree that in calculating the tax loss, which the district court found

to be $274,389, the court erroneously included $78,680 of Damra's personal tax loss.[11] The appropriate tax loss should therefore have been $195,709. Had the district court correctly subtracted Damra's personal tax loss, Damra would have been sentenced at offense level 15, rather than at level 16. Accordingly, we find that the district court committed procedural error by miscalculating Damra's sentence, and we therefore vacate Damra's sentence and remand for re-sentencing at the appropriate level.

## X.

Damra next maintains that the district court committed procedural error by failing to rule on two objections he made to the district court's calculation of tax loss for sentencing: the first to the inclusion of a check for $250,000 from AIM to Eigen Software[12]; and the second to the *exclusion* (as a credit) of the $18,239.15 Fawaz paid in personal income tax on the $100,000 shifted from AIM to Fawaz. "Procedural error may also occur if the sentencing judge fails to 'set forth enough [of a statement of reasons] to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority.'" *United States v. Lalonde*, 509 F.3d 750, 769-70 (6th Cir. 2007) (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)). "When a defendant raises a particular[, nonfrivolous] argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010) (citing *United States v. Gapinski*, 561 F.3d 467, 474 (6th Cir. 2009)).

---

[11] The government continues to maintain both that "it was appropriate" for the district court to take the personal tax loss into account, and that "the trial court should have included" an additional $500,000 into the computation of tax loss. The government, however, has not appealed the sentencing decision.

[12] There was also a $500,000 check discovered after trial that the district court declined to include in its tax-loss calculation. Accordingly, although only $250,000 is now in question, the parties often focus on the combined amount of $750,000.

**A. As to the $250,000 paid by AIM directly to Eigen Software**.

The district court included in its calculation of Damra's tax-loss deficiency a $250,000 check from AIM to Eigen, which was written on December 30, 1999 and which was deposited early in 2000. (On his tax return for 2000, which he filed in April of 2001, Damra declared and paid tax on $750,000 of capital gains. He maintains, apparently without any proof other than his own assertion, that this $750,000 was made up of the "same funds" AIM transferred to Eigen Software at the end of 1999.) Damra addressed this issue in his Sentencing Memorandum and at the sentencing hearings on October 29, 2007 and October 21, 2008, where Damra argued that the $250,000, in part, paid for distribution rights for Damra's personally-developed software, and so was appropriately deducted from AIM's taxes as "a software development expense." Damra here maintains that the district court continued to count the $250,000 in calculating his tax-loss deficiency, but never explained the basis for rejecting his argument. The government argues that "[t]he court did rule on defendant's objection, by rejecting any reduction in tax loss for this item. . . . The court then proceeded to sentence without making any adjustment, which was the correct determination." (Gov. Br. at 61.)

On April 9, 2009, six months after Damra filed his notice of appeal, the district court for the first time responded to this argument in denying Damra's motion for release pending appeal:

> As he has done in the instant motion, Mr. Damra challenged, both on the papers and during his sentencing hearing, the inclusion, for tax loss computation purposes, of check 10528 for $250,000 written on 30 December 1999 and drawing monies from AIM to Eigen Software. During the hearing, the Court considered the arguments and found the $250,000 check properly included the tax loss deficiency calculation as an improperly deducted corporate expense. The Court remains of the same mind. As the evidence indicated, Mr. Damra had to either report the $250,000.00 as consulting income on his 1999 Form 1040, reported as wages or salaries for 1999, or report the check on a Schedule C as consulting income. Mr. Damra did not pay the corporate income tax on this improperly deducted expense and it was properly included in the tax loss deficiency calculation amount of $274,389.00.

(R. 134 at 11.)

**B. As to the $18,239.15 paid by Fawaz in personal income tax**.

In his Sentencing Memorandum, Damra also argued that the court should have credited him with the $18,239.15 Fawaz paid in personal income tax on the $100,000 shifted from AIM to Fawaz as consulting income. It appears that, once again, the first time the district court explained its reasoning was in its April 9, 2009 order denying Damra's supplemental motion for release pending appeal, six months after Damra filed notice of appeal. In that document, the district court observed:

> Mr. Damra also argues here, as he did in his sentencing memorandum (Doc. 101), that the amount of tax paid by his brother on the $100,000 that the Defendant sent to Fawaz Damra should be subtracted from Alex Damra's tax loss deficiency calculation. Yet, just as the amount of tax owed by Fawaz Damra is not attributed to Alex Damra, so also the tax paid by Fawaz Damra is not properly deducted from the tax loss deficiency calculated against Alex Damra.

(R. 134 at 11.)

**C. Explanation Appropriate on Remand**.

While the district court clearly intended to reject both of Damra's arguments, the court failed to explain its basis for rejecting these arguments until six months after Damra filed his notice of appeal. Such a delay is not appropriate; a district court must explain the basis for rejecting a non-frivolous sentencing argument at the latest *before* the sentence becomes final and the defendant files notice of appeal. We have already determined, however, that this case must be remanded for resentencing. At resentencing, the court will have the opportunity to explain its reasons – including, perhaps, those already offered in the court's April 9, 2009 order – for rejecting Damra's arguments.

## XI.

Damra's final arguments address the substance of the district court's decisions in calculating his tax-loss deficiency, rather than the district court's failure to fully explain those decisions in a timely manner. Damra maintains that the district court erred in making this calculation both by including the $250,000 paid from AIM to Eigen

Software and by excluding the $18,239.15 Fawaz paid in personal income tax on the $100,000 shifted from AIM. "Tax loss" is defined by the Sentencing Guidelines, which state that "[i]f the offense involved tax evasion or a fraudulent or false return, statement, or other document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." U.S.S.G. § 2T1.1(c)(1). As we have already determined that Damra's sentence must be vacated, and the case remanded for resentencing, we need not rule on these two arguments at this time. While we leave it to the district court to make these determinations, however, we take the opportunity the make some observations to help guide the district court.

### A. As to the $250,000 paid by AIM directly to Eigen Software.

Damra argues that the $250,000 paid directly from AIM to Eigen Software should not be factored into his tax loss, as this money was appropriately used to pay for software development and appropriately deducted from AIM's books as a software-development expense. In support of this proposition, Damra cites the testimony at trial of Alan David and Barbara Burrer, who successively served as AIM's accountants. Damra, however, is quoting trial testimony selectively to try to indicate that AIM's accountants approved of the deduction of these funds as a business expense to AIM. In fact, in David's words: "I understood that it was a software development expense, and assumed it would be picked up as income, reported as income to this Eigen. Had I known that it was – or if it were a distribution of personal money, it would have been classified as a liquidating distribution." (Trial Tr. at 251.) Damra cites Burrer as testifying that Damra "had developed some" software and that the $750,000 was the cost to AIM of that software. (Damra Reply Br. at 24.) In fact, however, Burrer testified that *"[w]hat he told me* is that he had developed some – personally developed software, that he was selling the rights to the corporation. This 750 was for the '99 sale that he was reporting in the year 2000." (Trial Tr. at 281 (emphasis added).) Burrer went on to testify that the money "should have been deducted on the 1999 corporate tax return." (Trial Tr. at 281.) To summarize, neither David nor Burrer testified that they advised

Damra that this $250,000 represented a legitimate business deduction.  Instead, both testified that they received financial information regarding AIM from Damra.  Damra himself testified that the $250,000 represented "my share of what profit I made out of the old Applied Innovation Management in California."  (Trial Tr. At 745.)  "Profit" from AIM is, of course, not the same thing as money paid to Damra personally for the licensing rights to software.[13]

**B. As to the $18,239.15 paid by Fawaz in personal income tax**.

Damra also argues that in calculating the tax loss deficiency, the district court should have credited him with the $18,239.15 Fawaz paid in income tax on the shifted $100,000.  In response, the government cites the district court's conclusion that "just as the amount of tax owed by Fawaz Damra is not attributed to Alex Damra, so also the tax paid by Fawaz Damra is not properly deducted from the tax loss deficiency calculated against Alex Damra."  (R. 134 at 11.)

While there is little case law on when and whether a co-defendant's payment of personal income tax on shifted funds should be credited in calculating tax loss, given both the definition of "tax loss" in the Sentencing Guidelines and the explicit language of the indictment under which Damra was convicted, Damra has a reasonable point.  According to the Sentencing Guidelines, "the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)."   U.S.S.G.  §  2T1.1(c)(1).   In addressing whether this

---

[13]Damra also argues that the district court should have factored into its calculations of tax loss the personal income tax he paid in April of 2001 on the $750,000 of capital gains income (including this $250,000) he declared for 2000.  "[T]he IRS seeks to have the best of both worlds," Damra argues, "accepting Mr. Damra's taxes on the $750,000, yet denying the corporation the deduction for the business expense."  (Damra Reply Br. at 25.)  According to the Sentencing Guidelines, however, "[t]he tax loss is not reduced by any payment of the tax subsequent to the commission of the offense."  U.S.S.G. § 2T1.1(c) note 5.  The government, presumably looking to Count 2 (corporate tax evasion), maintains that the offense was completed when Fawaz filed the false 1999 tax return in August of 2000.  (According to Count 2, the offense began "on or about April 20, 2000, and continu[ed] through at least August 7, 2000 . . . ." (R. 1 at 8.))  Damra looks instead to Count 1 (conspiracy to defraud the United States), and argues that, according to the terms of the indictment itself, the conspiracy "continued to at least the end of August 2001."  (Damra Reply Br. at 25.)  The question, then, is whether the district court should have looked to Count 1 or Count 2 of the indictment in order to determine when the "offense" was committed.  As the issue with the $250,000 is whether AIM failed to pay appropriate corporate tax on the money, it seems appropriate to focus on Count 2.  Thus, whether Damra paid any personal income tax on this money in April of 2001 would not be relevant to determining his tax-loss deficiency.

$18,239.15 should be credited against Damra's tax loss, it is thus necessary to determine what loss would have resulted had the offense been successfully completed. According to Count 2 of the indictment, Damra "did willfully attempt to evade and defeat a large part of the income tax due and owing by" AIM by, in part, "causing a portion of those funds paid to his brother . . . to be falsely reported as Schedule C gross receipts on the Form 1040 filed jointly by Fawaz Damra and his wife for the year 1999." (R. 1 at 8.) The government itself has emphasized that the two affirmative acts in Count 2 of the indictment were pled in the conjunctive. The district court similarly relied on this fact, stating that "[t]he two affirmative acts enunciated in Count 2 were properly presented to the jury as collectively essential in the Indictment itself, in the arguments and evidence presented to the jury, and in the jury instructions." (R. 114 at 18.) As the record thus demonstrates, and as the government's own arguments and district court's own conclusions confirm, the theory under which Damra was convicted was that Damra transferred $100,000 from AIM to Fawaz *with the intention* of having Fawaz declare the money as taxable income. While, again, this is a question the district court should take up at resentencing, it seems that the object of the offense was apparently not to evade *all* taxes on the $100,000, but rather to evade the difference between the personal income tax Fawaz would owe on the one hand and the corporate income tax or disbursement tax AIM would owe on the other. Of course, it remains an open question whether the district court's decision either way on this issue would have any impact on Damra's sentence.[14]

## XII. CONCLUSION

We affirm Damra's convictions for both conspiracy to defraud the United States and corporate tax evasion. As both Damra and the government agree, however, in sentencing Damra the court incorrectly calculated the tax loss attributable to Damra, thus sentencing him at offense level 16 instead of offense level 15. Such an incorrect

---

[14] According to the tax-loss table of the 2000 Sentencing Guidelines § 2T4.1, under which Damra was sentenced, a tax loss of between $120,000 and $200,000 results in a sentencing level of 15. It seems likely that, even on resentencing, the tax loss attributable to Damra will still fall within this range – regardless of whether the court grants Damra credit for this $18,239.15.

calculation requires remand. Accordingly, we **AFFIRM** Fawaz's conviction, **VACATE** Fawaz's sentence, and **REMAND** for resentencing, at which the district court will have the opportunity to address Damra's arguments concerning the tax-loss calculation and to explain the basis of any decision it makes in response to those arguments.