NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0571n.06

No. 09-6548

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Aug 15, 2011**

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DANIEL B. LEWIS,

    Defendant-Appellant.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

_____ /

Before:    GIBBONS, STRANCH, and ROTH[*], Circuit Judges.

JANE R. ROTH, Circuit Judge.  Daniel Lewis appeals the denial of motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, and his subsequent conviction for conspiracy to defraud the United States by rigging EPA tests of injection wells.  The evidence presented by the government at trial showed that Lewis had directed two of his subordinates, Stan VanSickle and Kevin Wolfe, to rig the injection wells so that they would not fail EPA tests.  Lewis contends that the evidence was insufficient to show that these employees voluntarily conspired with him to falsify the tests and that the District Court therefore erred in denying his Rule 29 motion.  Because the government presented sufficient evidence for a rational jury to infer beyond a reasonable doubt that VanSickle and Wolfe conspired with Lewis to falsify the tests, we **AFFIRM** his conviction and sentence.

_____

[*]The Honorable Jane R. Roth, Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

**I.**

For several decades, Lewis worked at Roseclare Oil, LLC (Roseclare), which owned and operated a number of injection wells in Kentucky.[1] (R. 49, at 101-02.) An injection well functions by injecting "brine," a mixture of water, salt, and chemicals, deep under the ground in an oil-rich area to force oil up a nearby well, referred to as a production well. (R. 48, at 38-39.) The oil that is produced by this process is mixed with brine, so the brine is separated from the oil and reinjected to extract more oil. (R. 48, at 39-49.)

Roseclare's injection wells are subject to EPA regulations, *see* 40 C.F.R. §§ 144.1 *et seq.*, promulgated under the Safe Drinking Water Act, *see* 42 U.S.C. §§ 300h(a)(1). EPA regulations mandate a number of tests designed to ensure that brine–which is not safe to drink–does not leak from injection wells into the local water table and contaminate drinking water. (R. 48, at 39-40.) One of these tests is a mechanical integrity test, which tests whether the well leaks fluid under pressure. (R 48, at 42-43.) The test is performed by injecting air or fluid into the well's "annular space"–the space between the injection well's tubing and its outer casing–and then measuring the pressure of the air or fluid over time. (R 48, at 42-43.) The EPA requires that the annular space be pressurized to 300 psi and maintain that pressure for 30 minutes. (R 48, at 47.) An EPA official explained that the test is "kind of like blowing up a tire and seeing if there are leaks in the tire or not." (R 48, at 47.) Injection well operators typically test their wells themselves and ensure that they

---

[1]Because we are considering an appeal from the denial of a Rule 29 motion, we summarize the evidence presented by the government in its case in chief, drawing all reasonable inferences in the government's favor. *See* Fed. R. Crim. P. 29(b); *United States v. Damara*, 621 F.3d 474, 494 (6th Cir. 2010).

meet EPA standards before having an EPA official or contractor come out and observe a test. (R. 48, 59-60, 148-49.)

From 2003 to 2007, Lewis was a production superintendent at Roseclare and was responsible for all of Roseclare's field operations in Union County, Kentucky. (R. 48, at 103.) Stan VanSickle worked for Lewis and was responsible for pretesting injection wells, a task previously handled by Lewis. (R. 49, at 196-97.) VanSickle testified that, when five or six wells failed the pretest, Lewis instructed him to "fix" the wells by installing a bypass device, or "manifold." (R. 49, 66-67.) The bypass device was a hose attached to the wellhead that ran underground to a large piece of pipe closed at both ends and buried under the ground. (R. 49, at 67.) The device was designed so that when a well was tested by pumping it full of air or fluid, the air or fluid would be diverted from the well's annular space to the hose and into the buried pipe. (R. 48, at 53; R. 49, at 67.) The test would therefore reflect, not the pressure in the well's annular space, but the pressure in the buried pipe. (R. 49, at 67.) VanSickle installed the bypass devices with the help of Kevin Wolfe, who welded the devices, and Lewis or his son, who helped to bury the devices once they were attached to the failing wells. (R. 49, at 44, 67.)

Both Wolfe and VanSickle testified that they knew the bypass devices were being installed for the improper purpose of "fixing" a failed well so that it would pass EPA tests. (R. 49, at 44, 65-67.) After he was fired in 2007, VanSickle informed the EPA that Lewis had installed bypass devices to circumvent EPA tests. (R.49, at 70-71.) VanSickle then went with an EPA contractor to four wells and dug up the area around the wells to reveal the bypass devices. (R. 48, at 115.) The contractor took photographs of the wells and bypass devices. (R. 48, at 115.) The EPA then

scheduled mechanical integrity tests on these four wells. (R.49, 83.) The night before the tests, the EPA sent criminal investigators to Lewis's house to ask him about the wells. (R. 49, at 83-84.) Lewis spoke with the investigators and initially denied that any of the wells were rigged to pass the tests. (R. 49, at 89.) The investigators then showed Lewis photographs taken of the four wells with exposed bypass devices, and he admitted that some wells had been rigged to pass the tests. (R. 49, at 89-90.) He acknowledged that, as a result, the EPA tests performed on these wells were "fraudulent," because they were not actually testing the pressure in the wells. (R. 49, at 92.) The following day, the EPA performed its scheduled mechanical integrity tests on the four wells. (R. 48, at 97-98.) Although these four wells passed a properly administered test, subsequent EPA tests revealed seven other wells that were rigged with bypass devices that produced false test results. (R. 48, at 69, 97-98.)

Lewis was subsequently indicted for conspiring with VanSickle and Wolfe to violate the Safe Water Drinking Act, 42 U.S.C. § 300h-2(b), violate the False Statements Act, 18 U.S.C. § 1001(a), and defraud the United States by obstructing the efforts of the EPA to enforce its environmental regulations. *See* 18 U.S.C. § 371; (R. 1, ¶¶ 1-2). At trial, the government established the facts we have summarized above, presenting the testimony of VanSickle, Wolfe, and several EPA officials. (R. 48-49.) In his defense, Lewis presented the testimony of three people in the oil business in Kentucky that were familiar with the EPA's investigation of Lewis, the testimony of his wife and two character witnesses, and took the stand himself. (R. 49-50.) At the close of the government's case and again at the end of the trial, Lewis moved for a summary judgment of acquittal and for a

new trial. (R. 49, at 99; R. 50, at 52.) The District Court denied his Rule 29 motions, and the jury convicted Lewis. (R. 39.)

## II.

We review the denial of a properly preserved Rule 29 motion based on sufficiency of the evidence under the same standard we apply to a challenge to the sufficiency of the evidence on appeal: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[.]" *United States v. Damara*, 621 F.3d 474, 494 (6th Cir. 2010). To convict Lewis of conspiracy to defraud under 18 U.S.C. § 371, the government was required to prove (1) that Lewis and VanSickle and Wolfe agreed to violate the False Statements Act and the Safe Water Drinking Act and to obstruct EPA's enforcement of its regulations by rigging injection wells to falsify EPA tests, (2) that Lewis knowingly and intentionally entered the agreement, and (3) that Lewis, VanSickle, or Wolfe committed one or more overt acts "constituting actual participation in the conspiracy." *United States v. Blackwell*, 459 F.3d 739, 760 (6th Cir. 2006).

Lewis contends that there was insufficient evidence that VanSickle and Wolfe voluntarily conspired with him. This contention is plainly without merit. Both VanSickle and Wolfe testified that Lewis directed them to make or install bypass devices, that they understood the purpose of the devices was to rig wells to produce false EPA test results, and that they actually participated in the making or installing of these devices. A government witness also testified that Lewis had admitted that he had participated in rigging some of the wells with bypass devices and that rigged wells produced "fraudulent" test results. The jury could rationally infer from this testimony that VanSickle

and Wolfe agreed with Lewis to engage in this illegal scheme. *See United States v. Warshak*, 631 F.3d 266, 309 (6th Cir. 2010) (conspiracy may be inferred from coordinated conduct). The fact that VanSickle and Wolfe were acting at Lewis's direction does not preclude an inference of conspiracy,[2] s*ee Susnjar v. United States*, 27 F.2d 223, 224 (6th Cir. 1928) (employee is not immune from conspiracy liability simply because he acted at employer's direction), and in any case would have no bearing on whether Lewis–the defendant–voluntarily participated in the conspiracy, which is all the government was required to prove.[3] *See Damara*, 621 F.3d at 499 (defendant must knowingly and voluntarily join conspiracy); *Blackwell*, 459 F.3d at 760 (listing elements of conspiracy).

## III.

The government's evidence was more than sufficient to support Lewis's conviction and his Rule 29 motions were therefore properly denied. Accordingly, we **AFFIRM** Lewis's judgment of conviction and sentence.

---

[2]There is no evidence supporting Lewis's assertion that VanSickle or Wolfe would have been fired if they had refused to participate in his scheme. Lewis points out that in 2007 VanSickle was fired and threatened to notify the EPA about the bypass devices, but VanSickle testified that he was fired *before* making this threat. (R. 49, at 72.) In any case, the threat of losing a job would not excuse VanSickle or Wolfe's participation in the conspiracy. *See United States v. Campbell*, 675 F.2d 815, 820-21 (6th Cir. 1982) (duress defense requires showing unavoidable threat of death or serious bodily harm at time the crime was committed).

[3]Even if Lewis's supposed coercion would afford VanSickle or Wolfe a defense if they were prosecuted for conspiracy, the possibility of their acquittal in a separate trial cannot help Lewis. *See United States v. Sachs*, 801 F.2d 839, 845 (6th Cir. 1986) (conspiracy conviction should not be reversed where co-conspirators are acquitted in separate trial).